**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHARLES BRANDT,** | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 13-305** |
| **JOHN E. WETZEL,** | ) | **Judge Arthur J. Schwab** |
| <u>et</u> <u>al.</u>, | ) | |
| **Respondents.** | ) | |

# O P I N I O N

Before this Court is a petition for a writ of habeas corpus filed by state prisoner

Charles Brandt pursuant to 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective

Death Penalty Act of 1996 ("AEDPA"). On September 14, 2007, an Erie County jury convicted

him of first degree murder in the death of Jennifer Pytlarz. It also convicted him of several other

crimes, including voluntary manslaughter in the death of he and Jennifer's almost full term

unborn baby. The only judgment of sentence that Brandt challenges is his first degree murder

conviction. He does not dispute that he killed Jennifer. He maintains that but for his trial

counsel's ineffective assistance, there is a reasonable probability that the jury would have

accepted his defense that he killed her in the "heat of passion" and was, therefore, guilty of

voluntary manslaughter, not first degree murder.

After careful consideration, the Court concludes that Brandt is not entitled to habeas

relief. Therefore, his petition is denied. A certificate of appealability also is denied.

# I.    Background[1]

In 2006, Brandt, who was then age 24, and Jennifer, who was age 27, worked at a Red Apple Kwik Fill gas station and convenience store in Erie County. Brandt was living with another woman and had two children with her. He and Jennifer had had an affair and she was pregnant. By September 23, 2006, Jennifer was due to give birth to their baby, whom she had named Alyssa. She was having contractions and was told by her doctor to go home and rest. She instead snuck out her parents' home and went to the Kwik Fill station because Brandt was working there that evening. She never returned home. Given her condition and the statements made to the police by witnesses who were at the Kwik Fill station that evening, Jennifer's family and the police immediately feared the worst. The police interviewed Brandt, but he denied harming Jennifer, whose body had not been found.

Late in the afternoon on Monday, September 25, 2006, Brandt's friend, Nicolas Aldrich, gave a statement to the police in which he informed them that Brandt had killed Jennifer and had solicited his help in disposing of her body. Brandt was arrested and he confessed to killing Jennifer but claimed that her death was an accident. The next day, Brandt took the police to the location where he had buried Jennifer's body. She still had a fabric ligature tightly wound around her neck, which was admitted at Brandt's subsequent trial as Commonwealth Exhibit 1. As discussed more fully below, the autopsy revealed that she died due to asphyxiation, and that her unborn child died a few minutes afterwards once the oxygen supply from her mother was cut off.

---

[1]    The Respondents have submitted paper copies of the relevant appeal briefs and the Court of Common Pleas of Erie County's file for this case. They filed electronically the transcripts for the trial and the post-conviction hearing at ECF Nos. 9 and 10, respectively. Brandt filed electronically the relevant state court decisions as exhibits to the petition.

Brandt's trial in the Court of Common Pleas of Erie County commenced on September 12, 2007. He was tried with co-defendant Aldrich, who was charged with criminal conspiracy and tampering with or fabricating physical evidence. Daniel J. Brabender, Esquire, represented Brandt. John B. Carlson, Esquire, represented Aldrich.

The first two witnesses for the Commonwealth were Destiny and Charlsea Sharp. They were employees at the Kwik Fill station and knew Brandt and Jennifer. They testified that Brandt would not admit that he was the father of Jennifer's baby. In fact, he denied have a sexual relationship with her and disparaged her when he spoke about her. 9/12/07 Trial Tr. at 36, 45, 63-65, 70.

Destiny and Charlsea each stopped at the Kwik Fill station at different times the evening of Saturday, September 23, 2006. Charlsea went there first, at around 9:20 p.m. She saw Jennifer and Brandt standing at the store's counter. She did not notice anything amiss between them. Charlsea spoke with Jennifer and described to the jury what she was wearing. The prosecutor showed Charlsea Commonwealth Exhibit 1, which was the ligature Brandt used to strangle Jennifer, and asked her if Jennifer was wearing it around her neck when she saw her that evening. Charlsea said that Jennifer was not wearing the ligature and that she never saw her wear it on any other occasion. Id. at 60-61. This testimony was significant because Brandt told the psychiatrist that testified as an expert for the defense that Jennifer was wearing the ligature around her neck, that he grabbed it when she was fighting with him only in order to calm her down, and that he accidently strangled her with it in about 30 seconds.

Several other witnesses gave testimony that corroborated Charlsea's testimony on this point. Detective Sergeant Michael Kabasinski, the lead investigator on the case, reviewed the Kwik Fill station's surveillance video for the night in question, which only taped activities inside

the convenience store. He testified that Jennifer appeared on the video and that the "ligature was never observed on [her]." 9/13/07 Trial Tr. at 128. Dana Marie Bahm, who was Jennifer's best friend, testified that in the ten years that she knew Jennifer, she never saw her wear the ligature or anything like it. She also testified that she saw Jennifer earlier in the evening on Saturday, September 23, 2006, and that Jennifer was not wearing the ligature at that time. 9/12/07 Trial Tr. at 128-29. Similarly, Destiny was friends with Jennifer and spent time with her outside of work. She testified that she never saw Jennifer wear anything like the ligature at work or outside of work. Id. at 46-47. Finally, the prosecutor asked Jennifer's father, John Pytlarz: "did you ever see that item [the ligature] on your daughter in all the time that she resided with you prior to her death?" John Pytlarz responded: "Never." He also responded "no" to the question of whether the ligature was "similar to anything that she would wear around her neck as any kind of jewelry or anything else?" Id. at 150.

Destiny testified that she stopped at the Kwik Fill station at around 9:50 p.m., which was about thirty minutes after Charlsea had been there. Id. at 31. She saw Jennifer's car in the parking lot, but when she entered the store nobody was inside. Id. at 31-34. Destiny walked outside and saw Brandt running from the direction of the dumpsters. She asked him what he was doing, and he told her that he was trying to catch stray cats. Destiny then asked him why Jennifer's car was parked in the lot, and he told her that Jennifer had left in a friend's car. Id. at 36-39.

Destiny went back inside the store to make a purchase. When she exited, she started walking towards the dumpsters "to see what [Brandt] was doing back there." Id. at 39. Brandt followed her outside. It was at this point that Destiny saw Jennifer lying face down near the dumpster and on the north side of a nearby guardrail. Id. Inexplicably, Destiny did not become concerned and instead thought that Brandt and Jennifer had been "messing around" behind the

4

dumpster and that Jennifer was hiding from her because Brandt did not want anyone to know about their relationship. Id. at 40-41.

Destiny went home and told Charlsea what she had observed. It was not until their aunt pointed out that a woman who was nine months pregnant would not be lying on her stomach outside that Destiny realized that Jennifer might be in serious trouble. She and her uncle went back out and parked their car across the street from the Kwik Fill station. Destiny saw Brandt back his car near the dumpster and then drag Jennifer's body over to the south side of the guardrail. At that point, she finally called the police. Id. at 42-44, 52-53.

In the meantime, Charlsea called the Kwik Fill station to see if Jennifer was still there. Brandt answered and told her that Jennifer had left. Charlsea then asked Brandt if he had killed Jennifer. He responded: "What are you guys going to do? Don't tell anyone." Id. at 63.

From the beginning, Brandt was the prime suspect in the disappearance of Jennifer. The police were initially unable to locate him. His girlfriend, Jennifer Stablein, testified that Brandt came home around 4:30 a.m. the morning of Sunday, September 24, 2006, took a shower, and then went to sleep. The next day, they went with their two children to her family's camp. Id. at 174-75. At around 5:00 p.m. that day, Brandt returned the phone call of Detective Kabasinski. Id. at 193. Brandt agreed to come to the police station and be interviewed. At around 7:00 p.m., he gave a videotaped statement in which he denied having any involvement in the disappearance of Jennifer. That statement was played for the jury. Judge John Garhart, who presided over both the trial and Brandt's subsequent Post Conviction Relief Act ("PCRA") proceeding, briefly summarized the videotaped statement as follows:

> When the subject of his interaction with Pytlarz was broached, Brandt immediately stated he did not like her, because she was a liar, and a thief who stole money from the Kwik-Fill. (Cmwlth. Trial Ex. 3.) Brandt also denied being

the father of Pytlarz's unborn child, stating he would never had [sic] sex with her because she "fucking stinks." <u>Id.</u>

<u>Commonwealth v. Brandt</u>, No. 9-2007, slip op. at 13 (C.P. Erie, Mar. 23, 2011) ("PCRA Opinion").

During this interview, Detective Kabasinski asked Brandt if it was an accident and to tell them where Jennifer's body was. Brandt denied that he harmed her. He was not under arrest at this time and he left the police station. <u>Id.</u> <u>See</u> <u>also</u> 9/12/07 Trial Tr. at 195-200.

The next afternoon, on Monday, September 25, 2006, at around 4:00 p.m., Detective Kabasinski and Detective Corporal Mitchell went to the Kwik Fill station to speak with Brandt again. For the next several hours, they discussed various things him. He continued to maintain that he had no involvement in Jennifer's disappearance. 9/12/07 Trial Tr. at 202-04. Brandt became "very agitated" when the detectives brought up Jennifer, but he did not cry or become upset. <u>Id.</u> at 204.

At around 7:20 p.m., Detective Kabasinski, who still was speaking with Brandt at the Kwik Fill station, received a call from another officer who told him that Aldrich had come to the police station and had reported that Brandt killed Jennifer and asked him to assist in disposing of her body. Aldrich told the police that he initially went with Brandt but that after he saw Jennifer's body in the trunk of the car he told Brandt that he could not be involved and left him. <u>Id.</u> at 230-31; 9/13/07 Trial Tr. at 22-27.

After Detective Kabasinski got off the phone with the officer at the police station, he walked back into the Kwik Fill station's back room, where Brandt was sitting, and explained to him "that the time has come now for him to do the right thing and to tell us where Jennifer Pytlarz was." <u>Id.</u> at 206. Brandt became upset, tried to leave, and Detective Kabasinski placed

him under arrest. Brandt then started to cry and said that he was sorry and that he wanted to take them to Jennifer's body. The detectives took him back to the police station and Brandt continued to say that he was sorry and that he did not intend to hurt Jennifer. He did not tell the officers that Jennifer had attacked him. Id. at 206-08.

Brandt requested an attorney and all questioning ceased. Later that evening, Brandt met with his father and an attorney. The attorney informed the police that Brandt was not prepared at that time to disclose the location of Jennifer's body. Id. at 235-36.[2] However, the next day, Tuesday, September 26, 2006, Brandt took the police to the burial site. He had buried Jennifer in in a shallow dirt grave in a wooded area about 50 to 60 feet off of Ivarae Road. 9/13/07 Trial Tr. at 81-97. When she was removed from the ground, the ligature that Brandt had used to strangle her was still wound tightly around her neck. Id. at 123.

Several other witnesses testified for the Commonwealth. One was a woman named Susan Ludwig. Because her testimony is at issue in one of the claims that Brandt now presents to this Court, it will be discussed. Ludwig, who was age 43, testified that she lived near the Kwik Fill station and went there almost daily to buy cigarettes. Id. at 154. She and Brandt were friendly and in February or March of 2006 they had sex at her apartment. Id. at 156. Soon afterward, Ludwig called Brandt's girlfriend, Stablein, because she "felt guilty for what [she] had done, and knowing that he was intimate with several other women, [she] thought she should be aware of this since she had a child with him." Id. at 157-58. Ludwig testified that she was just beginning to tell Stablein what had happened when Brandt grabbed the phone from Stablein and

---

[2]    At the PCRA hearing, it was revealed that Brandt's first attorney, Timothy Lucas, advised him not to reveal the location of Jennifer's body until after Lucas had a chance to consult with the District Attorney's Office. Lucas and the District Attorney met and agreed that if Brandt immediately disclosed where he buried Jennifer, the District Attorney's Office would not seek the death penalty. PCRA Hr'g Tr. at 4-5.

called Ludwig "a fucking bitch." He also said he knew where she lived and that he would get her and her cats. Ludwig testified that she did not consider Brandt to be a threat to her and she went back to the Kwik Fill station the next day. Id. at 158-59.

Ludwig and Brandt continued to speak to one another and at some point the subject of her cats came up again. During this conversation, she was complaining to Brandt about the burden of caring for so many foster cats. Brandt told her that he could take care of her problems for "thirteen cents ... the cost of a bullet." Id. at 159-60.

When Brabender attempted to cross-examine Ludwig about Brandt's "thirteen cents" comment, the court stopped him, id. at 172, and after she was done testifying instructed the jury:

> I'll say something to the jury here. It's clear to you now that we're here for a serious matter, an inquiry into the death of Jennifer Pytlarz, the accusation made by the Commonwealth in a trial of that charge.
> This testimony you just heard may be something that you find useful in your deliberations. But understand, what he thinks of cats, you know, those types of things, you're not here to pass any judgment on anything except on the charges made. Beyond that, don't use this for any other purpose. Don't let this stir up prejudice. It has a limited purpose. I want you to act rationally and not emotionally.

Id. at 177-78.

Dr. Eric Vey, a forensic pathologist who serves twelve counties in Northwestern Pennsylvania, including the County of Erie, performed the autopsies on Jennifer and Alyssa. He was the Commonwealth's final witness. He testified as an expert in the field of forensic pathology. He stated that Jennifer died "as a result of dual component asphyxiation." Id. at 182. Dr. Vey explained that this meant:

> that there's evidence of a ligature strangulation where a constricting agent was placed around the neck, cut off the blood supply to the brain, and, at the same time there was a manual component. In other words, there was use of the hands. And there are distinctive characteristic injuries that indicate that there was a manual component to this, and those deal with the fact that there is pressure

applied as the hands are placed over the mouth causing injuries to the inner lips as they rub and are pressed against the teeth and gums. And then there's a large abrasion to the left side of the neck or a scrape which shows focal bruising as well and it's likely from the palm of the hand.

Id. at 184. See also id. at 191-93.

Dr. Vey also explained how long it would take a person to die from asphyxiation:

The portrayal, the dramatic portrayals you see in cinema and TV are inaccurate. And it's just like many other things in medicine that are portrayed on television, there's no basis in fact. The scientific literature and studies undertaken with respect to the duration of consciousness when pressure is applied to the neck and how long it takes to die as a result of lack of blood flow to the brain are fairly dogmatic in the forensic literature.

        Now, there have been studies performed, there were a lot of studies – not a lot, there were a number of studies performed in the nineteen-forties that can't – they'll never be reduplicated in today's environment of ethics and informed consent and stuff like that. There have been studies performed in the late eighties and early nineties with martial art students where they were subject to bar holds and choke holds about the neck and how long it took them to lose consciousness. **When pressure is applied to the neck sufficient to cut off blood flow through the carotid arteries, loss of consciousness will occur in about 12 seconds. But if that pressure is removed, the person then will regain consciousness in about 10 to 12 seconds after the constricting agent is removed. Okay. So it takes a little while – I'm sorry. It doesn't take too long to lose consciousness, but it does take a while to die. And the literature is very clear on this point that with complete, unremitting, in other words, continual obstruction, of the carotid arteries, irreversible brain damage and death requires four to six minutes of unremitting, unrelenting, continual obstruction. Now, that interval, of course, can be prolonged if the hand of the assailant shifts or ligature shifts or the victim, before they lose consciousness, starts to resist or tries to fight off those efforts. So that's the minimum, is four to six minutes.**

Id. at 198-99 (emphasis added).

Dr. Vey testified that there were imprints on Jennifer's neck that indicated that Brandt

repositioned the ligature at least once. Id. at 190-91. He also testified:

During the course of every autopsy, and in particular this case[ ] where there's strangulation, an examination of the muscles of the neck and the soft tissues of the neck are undertaken. And there's a series of muscles that support the neck and attach to cartilage and bone structures in the voice box that allow us to support our head and talk. Those are called strap muscles. They're just referred to as strap

muscles. And there's four pairs of those. So there's four on each side. I'm not going to get into the nitty gritty details, but there were hemorrhage in all strap muscles of all layers of the neck, from the most exterior down to the deepest levels. In addition, there was actually hemorrhage behind the back of the throat on the right side. The significance of that is, that that implies that, apples to apples, the more hemorrhage you have and deeper the hemorrhage is, the greater the force and duration of events.

Id. at 200.

Near the conclusion of Dr. Vey's direct testimony, he reiterated that Jennifer died from being strangled for at least four to six minutes, and not, as the defense claimed to support the "heat of passion" voluntary manslaughter defense to first degree murder, for a mere 30 seconds:

Q.   Doctor, we talked about the – we saw the photos of the injuries. Do you have an opinion as to whether or not the injuries, ligature injuries we viewed around the neck of Jennifer Pytlarz's, could have been caused by someone holding the ligature for a period of 30 seconds?

A.   **No. Again, if that ligature was only applied for 30 seconds, number one, she wouldn't have died, and, number two, the degree of hemorrhage associated with the application of the ligature would not be as severe**.

Q.   You're talking about the hemorrhage, that's those straps and everything you were talking about?

A.   Yes, the deep hemorrhage into the strap muscles of the neck and behind the throat.

Q.   And if it was a 30 second application of Commonwealth's Exhibit Number 1, would we have that yellow area that was [sic] had no blood in it around the neck as well?

A.   The area of yellow discoloration and paleness develops with greater – the longer the ligature is applied, the yellower and more pale the ligature furrow imprint becomes.

Q.   Doctor, were you asked to render an opinion then as to how long that you believed the ligature around Jennifer Pytlarz's neck was pulled such as to cause her death?

A.   Yes.

10

Q.    And what is that opinion, doctor?

A.    **Again, the mechanism of death is cessation or termination or occlusion of arteries to the – I'm sorry, the blood vessels to and from the brain. And the literature indicates that irreversible brain damage and death require unremitting obstruction of those blood vessels for a period of four to six minutes.**

Q.    **We talked about repositioning the ligature, in this case did we not?**

A.    **Yes.**

Q.    **What does that mean to you then**?

A.    Again, any circumstance or condition that causes temporary loosening of the ligature will cause temporary restoration of blood flow to and from the brain, and, therefore, temporarily alleviate the absence of oxygen to the brain because the blood flow will be temporarily restored either for a second or, you know, even longer. So **any evidence that indicates that there was repositioning, also indicates that there's going to be temporary restoration of blood flow to the brain during this period where the thing is repositioned. And, therefore, the period of time required for irreversible brain damage and death occur – to another is going to be longer.**

Q.    **Extended then?**

A.    **Yes.**

Q.    **Longer than four to six minutes?**

A.    **Right. At the very least this is four to six minutes.**

Q.    **Doctor, do you hold that opinion within a reasonable degree of scientific certainty?**

A.    **Yes.**

Id. at 203-05 (emphasis added).

During cross-examination by Brabender, Dr. Vey clarified that Jennifer died from a lack

of oxygenated blood to flow to her the brain, which was caused when Brandt strangled Jennifer

with the ligature. He explained that he classified Jennifer's death as being caused by dual component asphyxiation because the physical evidence also indicated that at the same time Brandt was strangling Jennifer with the ligature, he also was manually smothering her mouth area, which would have restricted her oxygen source and, therefore, served as "an exasperation." Id. at 220, 228.

In his redirect examination, Dr. Vey reiterated that Jennifer's injuries were consistent with Brandt having held the ligature around Jennifer's neck with great force for a long duration:

Q.      Now, your report indicates the cause of death was dual component strangulation?

A.      Asphyxiation, yes.

Q.      Asphyxiation. You gave an opinion not 30 seconds, couldn't be 30 seconds?

A.      That's correct.

Q.      You've done almost 3,000 autopsies?

A.      Yes.

Q.      When you do autopsies, are there ever autopsies you do that you rule that the cause of death is unknown because you just don't know?

A.      Yes. That happens about once every year and a half.

Q.      All right. But this one you found dual component asphyxiation, correct?

A.      That's correct.

Q.      Given your opinion then, that it would be at least four minutes or more in this case because of repositioning of the ligature, correct?

A.      Yes.

Q.      Given that opinion and the dual component, is this something that your office would rule an accidental death?

A.    No.

Q.    Do you hold that opinion and all your other opinions today within a
reasonable degree of medical certainty?

A.    Yes, I do.

- - -

Q.    Given the extent of damage to the muscle strap or the straps in the muscle
– the straps in the neck, the deepness of those, you testified to that.

A.    Yes.

Q.    **Is that something that is consistent with someone pulling it tight and
walking away, or more consistent with someone holding it and
creating that damage to the tissue?**

A.    **That's – the injuries on the strap muscles of the neck and the extent of
the hemorrhage, which were pretty profound in this instance and very
deep, indicates that the magnitude of the constrictor – constricting
agent, the force was great and that the duration was long.**

Q.    **Consistent?**

A.    **Yes.**

Id. at 226-27, 229-30 (emphasis added).

After Dr. Vey testified, the Commonwealth rested its case. The next day, Brandt

presented three witnesses in his defense case. The first defense witness was Judy Reinwald, who

managed twelve Kwik Fill stations, including the one that Brandt and Jennifer had worked at.

She testified that Brandt was a good employee and that she was shocked when she learned that

he killed Jennifer. She also stated that the ligature that Brandt used to strangle Jennifer was not

an item that was sold or used at the Kwik Fill stations. 9/14/06 Trial Tr. at 21-23. The second

defense witness was Joel Barker, who grew up with Brandt. He testified that Brandt told him that

Jennifer's death was an accident. Id. at 26-27. On cross-examination, Barker admitted that when

he spoke to the police he did not report that Brandt had described the incident as an accident. Id. at 32.

The third and final defense witness was a psychiatrist, Dr. Robert Wettstein. The trial court permitted him to testify as an expert in the field of forensic psychiatry and to offer his opinion on the limited issue of whether Brandt acted in the heat of passion, in accordance with Commonwealth v. McCusker, 292 A.2d 286 (Pa. 1972). 9/13/07 Trial Tr. at 232-33, 243-45; 9/14/07 Trial Tr. at 3-16.

Dr. Wettstein explained that in order to reach his opinion, he interviewed Brandt and his parents and examined various legal and medical records. He also performed a personality assessment of Brandt. 9/14/07 Trial Tr. at 40-42. Dr. Wettstein recounted several things that Brandt told him, which in turn aided him in formulating his ultimate opinion. Dr. Wettstein testified that Brandt told him that when Jennifer came into the Kwik Fill station the evening in question she was irritable, angry, and abrupt with him, and eventually started yelling and screaming at him. Brandt also said that Jennifer told him that she wanted him to break up with his girlfriend and start a relationship with her, and that if he did not she would call Children and Youth Services and report that his girlfriend was an unfit parent. Dr. Wettstein testified that Brandt also maintained that Jennifer was wearing the ligature around her neck. Id. at 49-51.

Dr. Wettstein also testified as to what Brandt told him regarding how he came to strangle Jennifer. Brandt told Dr. Wettstein that he left the store and walked outside and that:

> … he gets underneath the car with a flashlight to search for this gasoline leak. This is in the parking lot of the Kwik Fill. And then the victim starts cursing at him, "Fuck you, Chuck." Starts kicking at him while he's under the car, slaps him, punches him, and he stands up and she continues to kick him. She says, according to him, "If I can't have you, then no one can."
> She also threatens to call the police and say that he had raped her. So this – so her tone is argumentative. She admits to having lied to him about the birth

14

control pills, and he says that at some point she becomes hysterical. Screaming and yelling "You have ruined my life. I'll make your life hell." She told him that she would kill him so that no one else could have him if she couldn't have him. She picked up a plastic soda bottle, threw it at him, struck him on the left collarbone. She kicked his car, slapped his window, took the flashlight that he had from the ground and threw it at him when he was standing up, although it didn't actually hit him, went over to the guardrail.

He became enraged at this point that she wouldn't stop attacking him. She was screaming. She was verbally and physically assaulting him. So he went over to pick up the flashlight which she had just thrown by the guardrail. At that time he grabs the cloth around her neck. It was already around her neck he told me. He grabs the cloth and he's trying to restrain her, to slow her down, to calm her down, to get her to stop hitting him, to get her to settle down a little bit because she was so emotionally distraught.

He remembered that he was angry himself, he was scared. He was scared that – that – he was scared that she would hurt herself. He was scared that she would hurt the baby. He was scared that she would hurt him with this flashlight. So he's holding this cloth. He told me he held the cloth and he didn't remember how long but he said maybe about 30 seconds. It's hard to remember the timing exactly. He said he was trying to settle her down, trying to quiet her down. Wasn't trying to hurt her, wasn't trying to kill her.

And then a car approaches. This is at night, the headlights were on. So he sees this car coming and he abruptly let's go of the cloth. He goes back into the store because he's, you know, working there, and there's nobody else at the store that he is working. So he goes back to his job abruptly and then he doesn't know what to do. Thinks about calling the police but doesn't know what to do then.

So the customer comes in and he's selling a lottery ticket and then he goes back outside to look for the victim. He told me that for some reason she had apparently moved about six feet away from where she was when he had left her and he couldn't understand how that could have occurred. He said he didn't know what to think to say or to do, and that's when Destiny comes in and sees the victim on the – victim's body on the ground lying there. And then he tells Destiny that the victim is faking it. He tells the victim to get up, this wasn't funny, as if this was a joke somehow the victim is playing on him, 'cause she was motionless, she was unresponsive on the ground at this point. So he rolls her over and sees the rope or the cloth is tied around her neck but he didn't think that she was dead at this point because she had moved six feet or so.

He told me that he attempted to loosen the cloth around her neck. He's not sure that he was able to do that. He didn't know what to do, got scared, thought about calling an ambulance, thought about calling the police, became afraid that he would be blamed or arrested if he did that. He started to call 911. I guess he didn't complete the call.

And he calls his friends, talks to his friends on the cell phone, tells him he doesn't know what to do but he may have accidentally killed someone. He told me he again tried to loosen the rope or cloth around the victim's neck but she

continued to be unresponsive. Asked him if he had ever choked her and he said he never choked her. He said he actually never actually touched her either, he just tried to loosen the cloth.

Id. at 51-54.

Dr. Wettstein testified that after his examination of Brandt, he concluded that Brandt had no mental disorder that would help explain his behavior on the night in question. However, given the circumstances of that evening **as Brandt had recounted them to him**, and also taking into consideration that Brandt had never displayed any violence before, Dr. Wettstein concluded that Brandt may have experienced an intense emotional reaction that "impaired or reduced" "his ability to think clearly and process information and to make sense and to handle the victim appropriately[.]" Id. at 55-56.

During cross-examination, Dr. Wettstein acknowledged that initially Brandt had lied to him and told him that he only had sex with Jennifer once. Id. at 61. Dr. Wettstein further acknowledged that he had not reviewed the surveillance video from the night in question and that if it showed, in contradiction to what Brandt had told him, that Jennifer was not wearing the ligature around her neck, he would have no reason to question what was on the video. Id. at 63. He also stated that Brandt "wasn't afraid for his life. Obviously someone throwing a soda bottle or kicking you can create anxiety, but he didn't think she was going to kill him." Id. When faced with other questionable or inexplicable things that Brandt had told him – such as that Jennifer, who was unconscious when he went into the store to wait on a customer, somehow had moved herself six feet over the guard rail and then passed out again, or that he had simply pulled at the ligature that was already around Jennifer's neck and it somehow became so tightly wound around it that he could not loosen it – Dr. Wettstein testified: "I'm reporting **what he told me**." Id. at 67-68.

Dr. Wettstein also acknowledged that what Brandt told him was contradicted by the physical evidence and Dr. Vey's expert opinion as a forensic pathologist:

Q.    You're not a forensic pathologist, correct?

A.    No.

Q.    Dr. Vey testified yesterday that the contusion was consistent with a punch to the eye of Jennifer Pytlarz. Would you have any reason to dispute that based on your reading of the autopsy report?

A.    Neither yes nor no.

Q.    Well, certainly if the defendant punched Jennifer Pytlarz that evening, that would be inconsistent with him saying he never touched her, correct?

A.    Yes.

Q.    And you also read, as part of Dr. Vey's report, that this was a dual component asphyxiation, correct?

A.    Yes.

Q.    That dual component being the pulling of the ligature and the hand over the face, correct?

A.    Face or the neck.

Q.    You did not observe the photograph concerning any injuries around the chin then, correct?

A.    Correct.

Q.    But that is in Dr. Vey's report, is it not, about the contusions found on the chin?

A.    Yes.

Q.    And if Dr. Vey testified yesterday that those contusions on Jennifer Pytlarz's chin were consistent with while she was being – while the ligature was being pulled, a hand was over here face, you would not be in a position to dispute that?

A.    No.

17

Q. And when you asked the defendant what about the hands over the face thing, what was his response?

A. **He couldn't really explain to me what the autopsy findings were. He couldn't reconcile the finding of the autopsy report with what he did himself as he remembered it.**

Q. He would not admit that he put his hand on his face and covered her mouth, correct?

A. Well he told me he hadn't touched her.

Id. at 68-70 (emphasis added).

Later in his cross-examination, Dr. Wettstein admitted that the value of his opinion was dependent upon whether the account of events that Brandt had given him was accurate:

Q. According to him, he had no intention of killing Jennifer Pytlarz?

A. Correct.

Q. It was all an accident. That, according to him, he did so out of anger and fear?

A. Correct.

Q. And regarding this ligature, he tells you that she came into the store with it, correct?

A. Yes.

Q. Doctor, if he said that he put this around her neck and then killed her with it, you wouldn't be here today, would you?

A. I don't know.

Q. Your conclusions would be much different if he said, I put this around her neck and I pulled it for four to six minutes, and, by the way, I accidentally killed her, correct?

A. I might not be here.

- - -

Q.   Now, very important is that last paragraph of your report. It says "limitations," correct, doctor?

A.   Yes.

Q.   What you basically said is the quality, accuracy, and quantity of data in part determined the validity of resulting forensic opinion. All opinions are subject to change upon receipt of additional information. That how it read, doctor?

A.   That's correct.

Q.   What that essentially means is, if the defendant is telling you lies about how everything happened, then your opinion is out the window, essentially, correct?

A.   That opinion would be. I mean, it clearly – I'm here to present what he's told me. I wasn't there.
         - - -
      . . . So I'm here to present what he told me. And, based on those facts, this is what I'm saying.

Q.   Right. So, if the facts are inaccurate, that's your limitation part. If the facts are inaccurate, so is your – so are your conclusions.

A.   Sure. Any time the facts are different, give me a different set of facts and my opinion may well be different.

Id. at 73-74, 76-77.

After Dr. Wettstein left the stand, the court instructed the jury:

Ladies and gentlemen, given we've just heard from Dr. Wettstein and given the nature of expert testimony in this area and some of the issues, I think it's appropriate to address you.
       When an expert witness testifies, as Dr. Wettstein just did, he's permitted, and indeed required, to testify about the underlying facts and data that support his opinion and evidence which would otherwise be inadmissible, … what the defendant said in the jail is hearsay, he can tell you about it. Okay. Why does he have the opinion he has? Because of what he heard.
       But I need to tell you that those facts and the data he considered for his opinion are not substantive evidence. In other words, they are not admitted as truthful or for their truthfulness. He has an opinion, he's telling you why. But there's been no independent admission of those facts as evidence. An expert

witness cannot be the conduit for the testimony of another person who should
properly be a witness.

      - - -

      Remember, you, as jurors, are the sole judges of the credibility and weight
of all testimony. The fact that the lawyers or myself may have referred to certain
witnesses as experts and the witness may have special knowledge or skill does not
mean that their testimony or opinions are right.

      When you are determining the credibility and weight of an expert's
testimony and opinion, you should consider all the factors that I've described now
and later in my charge that are relevant when evaluating the testimony of any
witness.

      You should also consider all other things bearing on the credibility and
weight, including the training of the witness and the factual information which he
or she based an opinion, the source and reliability of that information, and the
reasonableness of any explanation the expert provided to support his opinion.

Id. at 81-84.

      The court instructed the jury on first degree murder, third degree murder, and voluntary

manslaughter. It explained that in order to find that Brandt committed either first degree or third

degree murder, it had to find beyond a reasonable doubt that Brandt committed the crime with

malice. For first degree murder, the court instructed, "[a] killing is with malice if the perpetrator

acts first with the intent to kill or, … the killing is willful, deliberate, and premeditated." Id. at

190-91. It also instructed:

      [T]he specific intent to kill needed for first degree does not require planning or
      previous thought for any particular length of time. It can occur quickly. All that is
      necessary is that there be time enough so that the defendant can and does form an
      intent to kill and is conscious of that intention.

Id. at 228.

      The court further instructed that "you can find malice and, by implication, murder, only if

you [are] satisfied beyond a reasonable doubt that the defendant was not acting under a sudden

and intense passion resulting from serious provocation by the victim." Id. at 194. In contrast to

murder, the court instructed, voluntary manslaughter is an intentional killing without malice. Id.

at 195. It explained that in order to find Brandt guilty of voluntary manslaughter with respect to the killing of Jennifer, the jury would have to find two things: (1) that he was acting under a serious and intense passion (2) that resulted from serious provocation from Jennifer. The court instructed that the first factor is measured by a subjective standard and the second factor is measured objectively by how a reasonable person confronted by the provocation Brandt was faced with would act. Id. at 195, 230-32.

The jury found Brandt guilty of first degree murder for Jennifer's death. It acquitted Aldrich on all charges. On November 5, 2007, the trial court sentenced him to life in prison without parole on the first degree murder conviction. The Superior Court of Pennsylvania affirmed his judgment of sentence on direct appeal.

Next, Brandt, through new counsel, filed a motion for collateral relief pursuant to the PCRA. He raised several claims in which he contended that he was denied his Sixth Amendment right to effective assistance of trial counsel. The PCRA court presided over an evidentiary hearing on January 6, 2011, at which Brandt's father, Brabender, and Jennifer Stablein testified. In addition, the parties stipulated to the testimony of Brandt's first attorney, Lucas.

On March 23, 2011, the PCRA court issued an Opinion and Order of the Court in which it denied Brandt's request for relief. Brandt, through counsel, filed an appeal with the Superior Court in which he claimed that Brabender provided him with ineffective assistance for failing to:

1.     request a jury instruction regarding Brandt's good character and for failing to object to the instruction's absence.[3]

---

[3]     Section 3.06 of the Pennsylvania Suggested Standard Jury Instruction provides in relevant part:

The law recognizes that a person of good character is not likely to commit a crime that is contrary to that person's nature. Evidence of good character may itself raise a reasonable doubt and require a verdict of not guilty.

2.　　　object to the testimony of Ludwig pursuant to Rule 404(b)(1) of the Pennsylvania Rules of Evidence, which provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."

3.　　　object or request a mistrial or limiting instruction to the prosecution's repeated reference, in both testimony and argument, to Brandt's exercise of his right to remain silent.

Brief of Appellant in <u>Commonwealth v. Brandt</u>, No. 653 WDA 2011 (Pa.Super. Aug. 22, 2011).

On July 11, 2012, the Superior Court, in a panel decision with one dissent, affirmed the PCRA court's decision to deny post-conviction relief. <u>Commonwealth v. Brandt</u>, No. 653 WDA 2011 (Pa.Super. July 11, 2012). It held, *inter alia*, that Brandt failed to establish that he was prejudiced by Brabender's alleged deficient performance.

In denying Brandt's first claim, the Superior Court held:

Brandt contends trial counsel was ineffective for failing to request, or object to the absence of, a jury instruction related to the good character evidence presented at trial. In making this argument, Brandt points to the cross-examination testimony of Stablein, who stated that Brandt had never been violent with her, and that he had a reputation to be a peaceful, nonviolent person. <u>See</u> N.T., 9/12/2007, at 179. Brandt also points to the testimony of his forensic psychiatrist, Dr. Robert Wettstein, who testified that Brandt had no history of violence and that the event at issue was out of character for Brandt. N.T., 9/14/2007, at 55. Brandt's argument is meritless.

Pennsylvania Rule of Evidence 404 provides, in relevant part: "In a criminal case, evidence of a pertinent trait of character of the accused is admissible when offered by the accused, or by the prosecution to rebut the same." Pa.R.E. 404(a)(1) (emphasis supplied). At trial, Brandt did not dispute that he killed Pytlarz. Since Brandt admitted to killing Jennifer Pytlarz, character evidence was not "pertinent" at all.

As this Court has explained: "While character evidence is admissible to prove that a defendant did not commit the charged crime, it is inadmissible where the issue is whether the defendant had a specific intent to kill or did not have that intent due to diminished capacity." <u>Commonwealth v. Kim</u>, 888 A.2d 847, 853 (Pa.Super. 2005) (quotations and citation omitted) (emphasis supplied), appeal denied, 899 A.2d 1122 (Pa. 2006). <u>See also</u> <u>Commonwealth v. Gwynn</u>, 723 A.2d 143, 151 (Pa. 1998), cert. denied, 529 U.S. 969 (1999); <u>Commonwealth v. Morley</u>, 681 A.2d 1254, 1260 (Pa. 1996).

Although the above-cited cases involved a diminished capacity defense, which was not raised here, the same principle regarding character evidence appears appropriate under the facts of this particular case where the defense contended that Brandt had an intense emotional reaction and reacted out of anger and fear of what Pytlarz might do. See N.T., 9/14/2007, at 57, 111. Therefore, the character evidence elicited from Stablien on cross-examination should be regarded as inadmissible. As such, Brandt would not have been entitled to a jury instruction regarding his alleged good character. See Kim, supra. Consequently, Brandt's claim of ineffectiveness based upon trial counsel's failure to request or object to the absence of such an instruction fails.

Brandt, No. 653 WDA 2011, slip op. at 8-10 (footnotes omitted). The Superior Court further held

that even if it accepted Brandt's contention that he was entitled to receive the good character

instruction, his claim that Brabender was ineffective for failing to request that instruction still

failed because Brandt was not prejudiced due to the "overwhelming and compelling evidence"

that the Commonwealth presented at his trial. Id. at 10 n.8.

In rejecting Brandt's claim regarding Ludwig's testimony, the Superior Court held:

Brandt claims that trial counsel was ineffective in failing to object to the testimony of Suzanne Ludwig as irrelevant, or request an additional limiting instruction. Brandt contends that "Ludwig's testimony cast [him] as a promiscuous cad who articulated violence towards cats." Brandt's Brief at 37-38, citing, inter alia, Pa.R.E. 404(b)(1) and 403, respectively. We find no merit in this claim of ineffectiveness.

Based upon our review, we agree with the PCRA court that Brandt failed to show that this testimony caused him to suffer prejudice, i.e., that there was a reasonable probability that the outcome of the trial would have been different but for counsel's failure to interpose an objection, or request an additional limiting instruction. See Boyer, supra. As the PCRA court aptly explained, Brandt's promiscuity and volatility were already before the jury:

[T]here simply is no reasonable probability that the outcome would have been different. Brandt's promiscuity was already well established, independent of Ludwig's testimony. At trial, both sides stipulated that Brandt was the father of Pytlarz's unborn child.... Further, Brandt's entire defense revolved around becoming angry with Pytlarz when she confronted Brandt about paternity. See [N.T., 9/12/07,] at 21 (during opening statements, Brandt is described as being in a state of anger). See also N.T., 9/14/2007, at

23

52 (Dr. Wettstein reports Brandt became enraged during the confrontation).

PCRA Court Opinion, 3/23/2011, at 11.

In addition to the PCRA court's reasoning, it bears emphasis that Ludwig, immediately after testifying that Brandt had threatened her and her cats, stated that she did not regard Brandt as a threat, and that she had returned to the Kwik Fill the next day. N.T., 9/13/2007, at 159. Moreover, the trial court gave a limiting instruction at the conclusion of Ludwig's testimony, and "the jury is presumed to follow the court's instructions." See Commonwealth v. Tedford, 960 A.2d 1, 37 (Pa. 2008). In sum, the testimony that Brandt argues was objectionable was already before the jury, was minimized by Ludwig in her later testimony, and was addressed by the trial court in its limiting instruction. Accordingly, we conclude that no relief is due on Brandt's claim that trial counsel was ineffective in failing to object to Ludwig's testimony or request a further limiting instruction.

Id. at 7-8 (footnote omitted, bracketed text in the Superior Court's decision).

To best understand Brandt's final claim and how it was adjudicated by the state court, it is helpful to review how Brandt presented it to the PCRA court. In his PCRA motion, Brandt pointed out that Aldrich's defense counsel, Attorney Carlson, understandably tried to make the point at trial that Brandt was not worried that Aldrich would reveal to the police the location of Jennifer's body before he could because Aldrich had abandoned Brandt and, therefore, did not know where Brandt had buried her. Toward that end, in questioning Detective Kabasinski, the following exchanged occurred:

BY MR. CARLSON

Q. When you took [Brandt] back to the station that night, you told us a little bit about it. You told us that he asked if he could take you to where she was, but, in fact, he wanted a lawyer first. And he didn't take you to where she was on the 25th; isn't that correct?

A. That is correct, he did not take us.

Q. And you did provide him with an attorney that evening?

A. Yes, we did.

24

Q.    And his attorney spoke to him, right?

A.    Yes.

Q.    And his attorney relayed to you that he was not prepared or willing to take you that night to the body, correct?

A.    His attorney informed me that he recanted and stated he would not take us to the body.

Q.    And at this point you let his dad go into the room with his attorney and speak to him?

A.    Yes.

A.    Yes, yes.

Q.    Again, after his father and attorney went back into the room, his attorney came back to you and said he was not willing to take you to where the body was, correct?

A.    That is correct.

Q.    And his attorney, nor [Brandt], expressed any concern that Mr. Aldrich might take and show you were the body was that night, correct?

                  - - -

A.    I did not … I did not have any further exchange of conversation with the defendant once he was at our station. I did not question him any further and I was simply going through his counsel at this point in time. And the counsel informed me he did not wish to take us to the body.

Q.    Fair to say that his [attorney], Mr. Lucas, did not express to you any concern that Mr. Aldrich might lead you to the body in the meantime either, correct?

A.    No, he did not.

9/12/07 Trial Tr. at 235-36. <u>See</u> <u>also</u> PCRA motion at 21.

Carlson argued on behalf of Aldrich that Brandt's conduct regarding disclosure was

consistent with Aldrich's defense that he did know where Brandt had buried Jennifer's body. In

his PCRA motion, Brandt contended that Carlson's strategy "gave the prosecution the opportunity to unconstitutionally comment on Brandt's post arrest silence" during the Commonwealth's closing argument when "the prosecutor commented on Brandt's silence – his subsequent unwillingness to disclose the location of the body – as evidence to rebut his claim of provocation and heat of passion[.]" Id. at 23. In support of this contention, Brandt cited to the following highlighted portion of the prosecutor's closing argument:

> He says he didn't intend it. Look at his actions. Compare to the shooting of the wife and the lover in bed. Look at his actions after it happened. Are they at all consistent? Ask yourself, are they all consistent with someone who kills in the heat of passion and simply regrets it because they momentarily saw red and couldn't help themselves?
> He throws her over a guardrail, Jennifer Pytlarz and Alyssa Pytlarz, over a guardrail. Then drags them back over, throws them into a trunk, talks about maybe burning them both, but ultimately decides to bury them both.
> He goes home to bed. Sleeps without problem, says his girlfriend. He goes to the Millcreek Police station where he spends, as I said, 55 minutes disparaging this woman.
> He walks out of that interview, he goes to camp, he goes to work, and Jennifer and Alyssa Pytlarz are now in the ground for 36 hours and he won't take us there. **He won't take us there even when he's caught. Does that sound at all like someone who just saw red for a moment and now wants to get it off his chest?** How many opportunities on that tape did you count in which the officers said, tell us it was an accident, tell us it was an accident?

9/14/07 Trial Tr. at 156 (emphasis added). See also PCRA motion at 23.

Brandt contended in his PCRA motion that the circumstances regarding the disclosure of Jennifer's body was based on him exercising his Fifth Amendment rights and acting on the advice of counsel. He argued that Brabender was ineffective for failing to do at least one of the following three things when the testimony was elicited by Carlson or when the argument was made by the prosecution: (1) request a severance; (2) request a mistrial; or, (3) request a limiting instruction. PCRA motion at 21-24. See also PCRA Hr'g Tr. at 103-09.

In denying this claim, the PCRA court first rejected Brandt's contention that Brabender was ineffective for failing to request a severance. The PCRA court pointed out that Carlson already had moved to sever Aldrich's and Brandt's cases and that it had denied that motion. It held: "A motion to sever filed by Attorney Brabender would have been denied too, so he cannot be deemed ineffective for failing to file such a motion." PCRA Opinion at 15-16 n.12.

With respect to Brabender's failure to properly respond to the prosecution's closing statement, the PCRA court held:

> As set forth earlier in the Findings of Fact, Brandt did not reveal the location of Pytlarz's body either before, or immediately after he was arrested. This state of refusal is a course of conduct that existed even before Brandt spoke with Attorney Lucas. See supra, Findings of Fact ¶¶ 1-6. Brandt believes the bolded portion [of the prosecutor's closing argument] was a comment on Brandt's post-arrest silence. By this comment, Brandt argues the Commonwealth used his unwillingness to disclose the location of the body to rebut his claim of provocation and heat of passion. As such, Brandt alleges Attorney Brabender was ineffective for not requesting a mistrial, or in the alternative, not requesting a limiting instruction with respect to Detective Kabasinski's testimony elicited by Attorney Carlson.
>
> - - -
>
> With respect to the Commonwealth's closing statement, the Court finds the portion of the closing statement at issue does not clearly refer to post-arrest silence. When read in the context of the entire paragraph, the preceding paragraph, and the two subsequent paragraphs, the statement, "He won't take us there even when he's caught," is fair comment on Brandt's initial interview with Detective Kabasinski on September 24, 2006 – the day before Brandt's arrest. Although use of the word, "caught," may imply arrest in some circumstances, here, it may be viewed as oratorical flair, used to describe Brandt's **awareness** that the police were closing in.
>
> Brandt was the prime suspect the moment Pytlarz was reported missing, and the police, based on their questioning at this pre-arrest interview ("tell us it was an accident"), had a strong belief that he was responsible for her death. Moreover, in explaining his movements during this pre-arrest interview, Brandt "knew he was lying, the detectives knew he was lying, [and] he knew the detectives knew he was lying". N.T., 9/12/07, at 21. For all practical purposes, Brandt was "caught." As this claim lacks arguable merit, it must be dismissed.

PCRA Opinion at 15-17 (emphasis in original, footnotes omitted).[4] The PCRA court further held

that even if the prosecutor's closing argument "clearly referenced" post-arrest silence, Brandt's

claim that Brabender was ineffective lacked merit because Brandt failed to establish that he was

prejudiced. In support this this conclusion, it noted that the "autopsy findings and opinion of

Dr. Vey were overwhelmingly compelling in this case." Id. at 17 n.17.

In rejecting Brandt's argument that Brabender was ineffective for not moving for a

mistrial or requesting a limiting instruction after Attorney Carlson elicited the challenged

testimony from Detective Kabasinski, the PCRA court held:

> Again, the Court finds this testimony does not clearly reference post-arrest
> silence. Thus, the claims with respect to this testimony lack merit, and must be
> dismissed. The rule regarding post-arrest silence is derived from the privilege
> against self-incrimination. Nothing Detective Kabasinski testified to refers to
> Brandt invoking his right to not incriminate himself with respect to the act of
> killing Pytlarz and their unborn child. Viewed in a light most favorable to Brandt,
> the testimony can be viewed as Brandt merely remaining silent on the location of
> Pytlarz's corpse. At this point, he had already freely incriminated himself by
> admitting to killing Pytlarz and their unborn child.

Id. at 17.

The PCRA court further held that even if Detective Kabasinski's testimony clearly

referenced post-arrest silence, Brandt was not prejudiced by Brabender's alleged failure to

properly respond to the testimony for the reasons it had already mentioned. Id.

---

[4]     Brabender stated in his opening remarks:

   Now, naturally Chuck Brandt was a prime suspect within minutes after this incident. On
   the next day [Sunday, September 24, 2006] Millcreek Police detectives, detectives
   Kabasinski and Heidt gave him a fair opportunity to explain his movements in the
   whereabouts of Jennifer Pytlarz. What followed was a ridiculous statement by
   Mr. Brandt. He knew he was lying, the detectives knew he was lying, he knew the
   detectives knew he was lying, and so on.

9/12/07 Trial Tr. at 21.

On appeal, the Superior Court agreed with the analysis of the PCRA court, although it did not specifically address Brandt's claim that Brabender failed to properly respond to the alleged improper testimony given by Detective Kabasinski.[5] Brandt, No. 653 WDA 2011, slip op. at 15-16. It held: "First, the prosecutor's comment [in the closing argument] does not **clearly** reference post-arrest silence, since it was immediately preceded and followed by the prosecutor's discussion of Brandt' initial, pre-arrest interview." Id. at 15 (emphasis in original). The Superior Court also held that it agreed with the PCRA court that even if the prosecutor's remark was an impermissible comment on Brandt's post-arrest silence, Brandt was not prejudiced "in view of the overwhelming, uncontradicted testimony" of Dr. Vey. Id. at 16.

Having received no relief in state court, Brandt filed with this Court a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 [ECF No. 1] in which he raises the same three claims of ineffective assistance that he raised to the Superior Court in his PCRA appeal. Section 2254 is the federal habeas statute applicable to state prisoners and it provides this Court with jurisdiction to consider Brandt's claims that his first degree murder conviction was obtained in violation of the Constitution of the United States (specifically, his Sixth Amendment to the effective assistance of counsel). 28 U.S.C. § 2254(a) ("a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or

---

[5]     In his brief to the Superior Court, Brandt also cited additional testimony given by Detective Kabasinski that he claimed improperly referenced his post-arrest silence. Brandt pointed to the instance when the prosecutor asked Detective Kabasinski: "Once you get back to the station, does he take you to Jennifer Pytlarz at all that evening?" Brief for Appellant in Brandt, No. 653 WDA 2011, at 26 (citing 9/12/07 Trial Tr. at 208). At another point in the questioning, Detective Kabasinski again explained that although Brandt was arrested Monday evening, he did not disclose the location of Jennifer's body until the next day. Id. at 27 (citing 9/12/07 Trial Tr. at 208-09). It does not appear to this Court that Brandt relied upon this testimony to support his claim when he presented it to the PCRA court.

treaties of the United States."). Errors of state law are not cognizable in a federal habeas proceeding. See, e.g., Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

Respondents have filed their Answer [ECF No.6] and the state court record.

## II.    Discussion

### A.    Standard Of Review

Because the Superior Court denied Brandt's claims on the merits,[6] this Court's analysis of each of them is governed by AEDPA's standard of review. AEDPA "imposes a highly deferential standard for reviewing claims of legal error by state courts[.]" Burt v. Titlow, — U.S. — , 134 S.Ct. 10, 15 (2013). AEDPA reflects the view that habeas corpus is a "'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington v. Richter, — U.S. — , 131 S.Ct. 770, 786 (2011) (quoting Jackson v. Virginia, 443 U.S. 307, 332, n. (1979) (Stevens, J., concurring in judgment)). Importantly, it is not for this Court to decide whether the Superior Court's decision was right or wrong. Under AEDPA, as codified at 28 U.S.C. § 2254, this Court's review is much more limited. It provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any

---

[6]    Brandt argues that because the Superior Court did not specifically discuss each instance in which he contended that his post-arrest silence was improperly referenced at trial, this Court should review the claim regarding his post-arrest silence de novo. This Court rejects that argument. The Superior Court did not need to discuss every argument that Brandt made in order for AEDPA's standard of review to apply. See, e.g., Thomas v. Horn, 570 F.3d 105, 115 (3d Cir. 2009); Rompilla v. Horn, 355 F.3d 233, 247-48 (3d Cir. 2004), rev'd on other grounds sub nom. Rompilla v. Beard, 545 U.S. 374 (2005) ("For purposes of [§ 2254(d)], a failure to decide affects the standard or review; a failure to discuss (either at all or to the satisfaction of the habeas petitioner or the federal court) is irrelevant.") (citing Weeks v. Angelone, 528 U.S. 225, 237 (2000) and Chadwick v. Janecka, 312 F.3d 597, 605-07 (3d Cir. 2002)). Moreover, there is no indication that the Superior Court misunderstood the nature of his claim and thus failed to adjudicate it on the merits. Nevertheless, even if this Court applied a de novo review to Brandt's claim that Brabender was ineffective for failing to properly respond to each of the alleged references to his post-arrest silence, this Court would still deny relief. For the reasons discussed below, Brandt cannot establish that he was prejudiced by Brandt's alleged deficient performance.

claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The "clearly established Federal law," 28 U.S.C. § 2254(d)(1), in which to analyze Brandt's ineffective assistance claims is governed by Strickland v. Washington, 466 U.S. 668 (1984). Under Strickland, Brandt must show that Brabender's representation fell below an objective standard of reasonableness. 466 U.S. at 688. The law presumes that Brabender was effective. Id. at 689. Strickland also requires that Brandt demonstrate that he was prejudiced by Brabender's alleged deficient performance. This requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of [his trial] proceeding would have been different." Id. at 694. As the United States Court of Appeals for the Third Circuit has explained:

> [The Petitioner] "need not show that counsel's deficient performance 'more likely than not altered the outcome of the case' – rather, he must show only 'a probability sufficient to undermine confidence in the outcome.'" Jacobs v. Horn, 395 F.3d 92, 105 (3d Cir. 2005) (quoting Strickland, 466 U.S. at 693-94). On the other hand, it is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Harrington, 131 S.Ct. at 787 (citing Strickland, 466 U.S. at 693). Counsel's errors must be "so serious as to deprive the defendant of a fair trial." Id. at 787-88 (citing Strickland, 466 U.S. at 687). The likelihood of a different result must be substantial, not just conceivable. Id.

Brown v. Wenerowicz, 663 F.3d 619, 630 (3d Cir. 2011).

The Supreme Court in Strickland also noted that although it had discussed the performance component of an effectiveness claim prior to the prejudice component, there is no

reason for an analysis of an ineffectiveness claim to proceed in that order. 466 U.S. at 697.

Consequently, if it is more efficient to dispose of an ineffectiveness claim on the ground of lack

of sufficient prejudice, this course should be followed. Id.

**B.      The Superior Court's Adjudication Was Not "Contrary To" <u>Strickland</u>**

"The test for § 2254(d)(1)'s 'contrary to' clause is whether the state court decision 'applies

a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or if it

confronts a set of facts that is materially indistinguishable from a decision of [the Supreme]

Court but reaches a different result.' <u>Brown v. Payton</u>, 544 U.S. 133, 141 (2005) (citing <u>Williams</u>

<u>v. Taylor</u>, 529 U.S. 362, 405 (2000), and <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24-25 (2002))."

<u>Rountree v. Balicki</u>, 640 F.3d 530, 537 (3d Cir. 2011) (parallel citations omitted). The Superior

Court applied the <u>Strickland</u> standard when it evaluated Brandt's claims. <u>Brandt</u>, No. 653 WDA

2011, slip op. at 4.[7] Accordingly, there can be no question that its adjudication of each of

Brandt's claims withstands review under the "contrary to" clause of § 2254(d)(1). <u>Williams</u>, 529

U.S. at 406 ("a run-of-the mill state-court decision applying the correct legal rule from [Supreme

Court] cases [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause.").

**C.      The Superior Court's Adjudication Was Not an "Unreasonable Application
         Of" <u>Strickland</u> Or Based On An Unreasonable Determination Of The Facts**

The only remaining inquiry for this Court is whether Brandt has demonstrated that the

Superior Court's adjudication of any of his claims was an "unreasonable application of"

---

[7]       Pennsylvania law for judging ineffectiveness corresponds with the <u>Strickland</u> standard.
<u>Commonwealth v. Pierce</u>, 527 A.2d 973, 976-77 (Pa. 1987); <u>Commonwealth v. Kimball</u>, 724 A.2d 326
(Pa. 1999). Although Pennsylvania courts typically articulate a three-prong test for gauging ineffective
assistance claims and <u>Strickland</u> sets forth its test in two prongs, the legal evaluation is the same, and the
differences merely reflect a stylistic choice on the part of state courts.

Strickland or was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1), (2). The Supreme Court has stressed repeatedly the "highly deferential" review that this Court must accord the state court's decision in conducting the "unreasonable application" analysis:

> We have explained that "an unreasonable application of federal law is different from an incorrect application of federal law." Williams v. Taylor, 529 U.S. 362, 410 (2000). Indeed, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id., at 411. Rather, that application must be "objectively unreasonable." Id., at 409. This distinction creates "a substantially higher threshold" for obtaining relief than de novo review. Schriro v. Landrigan, 550 U.S. 465, 473 (2007). AEDPA thus imposes a "highly deferential standard for evaluating state-court rulings," Lindh v. Murphy, 521 U.S. 320, 333, n.7 (1997), and "demands that state-court decisions be given the benefit of the doubt," Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam).

Renico v. Lett, 559 U.S. 766, 773 (2010) (parallel citations omitted). See also White v. Woodall, — U.S. —, 134 S.Ct. 1697, 1702 (2014) ("an 'unreasonable application of' [the Supreme Court's] holdings must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice.") (quoting Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003)).

The Supreme Court also has advised:

> It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. See Lockyer, supra, at 75.
> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. Cf. Felker v. Turpin, 518 U.S. 651, 664 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther…. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Harrington, 131 S.Ct. at 786-87 (parallel citations omitted)

The Supreme Court emphasized that same theme in another recent decision:

> AEDPA recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights. "[T]he States possess sovereignty concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause. Under this system of dual sovereignty, we have consistently held that state courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States." Tafflin v. Levitt, 493 U.S. 455, 458 (1990). This principle applies to claimed violations of constitutional, as well as statutory, rights. See Trainor v. Hernandez, 431 U.S. 434, 443 (1977). Indeed, "state have the solemn responsibility equally with the federal courts to safeguard constitutional rights," and this Court has refused to sanction any decision that would "reflec[t] negatively upon [a] state court's ability to do so." Ibid. (internal quotation marks omitted)….
>
> Recognizing the duty and ability of our state-court colleagues to adjudicate claims of constitutional wrong, AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court. AEDPA requires "a state prisoner [to] show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error ... beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. —, — 131 S.Ct. 770, 786-787 (2011). "If this standard is difficult to meet" – and it is – "that is because it was meant to be." Id., at —, 131 S.Ct., at 786. We will not lightly conclude that a State's criminal justice system has experienced the "extreme malfunctio[n]" for which federal habeas relief is the remedy. Id., at —, 131 S.Ct., at 786 (internal quotation marks omitted).

Burt, 134 S.Ct. at 15-16 (parallel citations omitted).

Finally, this Court also is mindful that:

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," [Strickland, 466 U.S.] at 689; Lindh v. Murphy, 521 U.S. 320, 333, n.7 (1997), and when the two apply in tandem, review is "doubly" so, [Knowles v. Mirzayance, 556 U.S. 111, 123 (2009)]. The Strickland standard is a general one, so the range of reasonable applications is substantial. [Id.] Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Harrington, 131 S.Ct. at 788 (parallel citations omitted).

In evaluating Brandt's claim that Brabender was ineffective for not requesting the good character instruction, the Superior Court determined that Brandt was not entitled to that instruction under Pennsylvania law. This Court may not re-examine that state law holding. See, e.g., Estelle, 502 U.S. at 67-68. See also Real v. Shannon, 600 F.3d 302, 309-10 (3d Cir. 2010); Priester v. Vaughn, 382 F.3d 394, 402 (3d Cir. 2004); Johnson v. Rosemeyer, 117 F.3d 104, 109 (3d Cir. 1997). Since Brabender cannot be found ineffective for failing to request an instruction to which Brandt was not entitled, see, e.g., Strickland, 466 U.S. at 691, Brandt cannot show that Brabender performance was deficient, let alone that the Superior Court's decision to deny relief on this claim "involved an unreasonable application of" Strickland or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). This claim also is denied for the alternative reason that the Superior Court's determination that Brandt was not prejudiced by the absence of the instruction due to the "overwhelming and compelling evidence" that the Commonwealth presented at his trial also withstands review under § 2254(d)(1) and (2) for the reasons discussed below.

As for Brandt's claim that Brabender was ineffective for failing to object to Ludwig's testimony or request a limiting instruction, he overstates the impact her testimony had on his trial. The PCRA court observed that her "call to Stablein shortly after [her] affair with Brandt, and other aspects of [her] demeanor and testimony at trial, did, in the Court's view, substantially destroy her credibility as a Commonwealth witness[,]" PCRA Opinion at 4 n.2, and the Superior Court's explanation as to why Brandt was not prejudiced by the introduction of her testimony requires little elaboration and withstands review under § 2254(d)(1) and (2). This Court only adds that, for the reasons discussed below, the strength of the Commonwealth's first degree

35

murder case is another reason that supports the finding that Brandt was not prejudiced by the introduction of Ludwig's testimony.

In his final claim, Brandt faults Brabender for failing to properly respond to the alleged instances in which Brandt's post-arrest silence was referenced. This Court does not need to determine whether Brabender's performance was deficient in this regard. That is because even if it was, the Superior Court's determination that Brandt was not prejudiced due to the strength of the Commonwealth's case against him withstands review under § 2254(d)(1) and (2). The Court of Appeals for the Third Circuit has held that "[i]t is firmly established that a court must consider[,]" as the Superior Court did here, "the strength of the evidence in deciding whether the Strickland prejudice prong has been satisfied." Buehl v. Vaughn, 166 F.3d 163, 172 (3d Cir. 1999) (citing Strickland, 466 U.S. at 695). This is so because "[a] court simply cannot" "determine whether there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different[,]" "without considering the strength of the evidence against the accused." Id.

As the Superior Court determined, the Commonwealth's case against Brandt, and in particular Dr. Vey's testimony, provided the jury with strong evidence from which it could conclude that Brandt committed first degree murder when he killed Jennifer. In contrast, Brandt's defense that he only was guilty of "heat of passion" voluntary manslaughter was weak. Even if Brabender did all of the things Brandt claims he should have done, Brandt's defense would not have been appreciably strengthened, nor would the Commonwealth's case have been undercut.

It must be remembered that in order for the jury to conclude that Brandt committed voluntary manslaughter, it had to find beyond a reasonable doubt two things: (1) that he was acting under a serious and intense passion (2) that resulted from serious provocation from the

36

victim. 9/14/07 Trial Tr. at 195, 230-32. This Court seriously doubts that the jury credited any of Dr. Wettstein's testimony. But even if it did, his testimony at most only demonstrated that Brandt may have been acting under a serious and intense passion. Dr. Wettstein's testimony did not provide sufficient evidence from which the jury could conclude that Brandt's actions resulted from serious provocation from the nine-months-pregnant Jennifer.

Brandt states that Dr. Vey's testimony was contradicted by Dr. Wettstein's testimony. That is incorrect. Dr. Vey's opinion was given as an expert in the field of forensic pathology. He performed the autopsy on both victims. His expert opinion that Brandt strangled Jennifer with the ligature for at least four to six minutes was premised upon his autopsy findings and the actual physical evidence. His expert opinion was not discredited during cross-examination or contradicted by the other evidence introduced at the trial.

In contrast, Dr. Wettstein's opinion was given as an expert in the field of forensic psychiatry. It was premised primarily upon what Brandt had told him, which conflicted with the actual evidence introduced at trial, including the autopsy report, the photographs of the injuries Jennifer sustained, and the testimony of several witnesses. For example, Brandt told Dr. Wettstein that Jennifer was wearing the ligature around her neck. But Charlsea Sharp spoke with Jennifer at the Kwik Fill station shortly before Brandt killed her, and Charlsea testified that Jennifer was not wearing the ligature. Detective Kabasinski reviewed the surveillance video and testified that Jennifer was not wearing the ligature. Destiny Sharp, Dana Marie Bahm, and John Pytlarz each testified that they never saw Jennifer wear the ligature or anything similar to it. Brandt also told Dr. Wettstein that he only held the ligature around Jennifer's neck for around 30 seconds, but Dr. Vey, who was competent to give an expert opinion on this precise issue, testified that if that were true Jennifer would not have died and the hemorrhage associated with

the application of the ligature would not have been as severe. Moreover, Dr. Wettstein did not offer an opinion as to how long Brandt strangled Jennifer. He was not qualified to speak to that issue and did not contend that he was. Brandt also told Dr. Wettstein that he did not touch Jennifer, but that statement, like some many other things that Brandt told him, conflicted with the actual physical evidence.

For all of these reasons, it is incorrect to say that Dr. Wettstein's testimony contradicted Dr. Vey's. They are experts in different fields and their opinions were premised upon different types of information. It also is safe to say that since Dr. Wettstein's opinion was almost totally dependent on the veracity of Brandt's statements to him, the value of his opinion was significantly if not completely undercut by the fact that so much of what Brandt had told him was contradicted by the actual evidence introduced at the trial. Dr. Wettstein did not dispute that if Brandt's statements to him were untrue, his opinion that Brandt may have experienced an intense emotional reaction that "impaired or reduced" "his ability to think clearly and process information and to make sense and to handle the victim appropriately[,]" 9/14/07 Trial Tr. at 55-56, would be "out the window," id. at 76-77.

Finally, in his petition Brandt quotes extensively from the opinion issued by the dissenting judge in his Superior Court appeal. Brandt's heavy reliance upon the dissent is misplaced. Once again, the question for this Court is not whether the Superior Court panel majority's decisions were right or wrong. Nor is this Court tasked with determining whether a reasonable jurist could disagree with the Superior Court panel majority's decisions. Rather, this Court's inquiry is whether any of the panel majority's decisions are "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility

for fairminded disagreement." <u>Harrington</u>, 131 S.Ct. at 786-87. This Court cannot answer that question in Brandt's favor.

Moreover, the dissenting judge also disagreed with certain state law determinations made by the panel majority. Brandt argues that the dissenting judge was correct, but the state court adjudication at issue in this case is the panel majority's decision and this Court cannot re-examine the determinations it made on state law questions. <u>See</u>, <u>e.g.</u>, <u>Estelle</u>, 502 U.S. at 67-68.

Based upon all of the foregoing, this Court concludes that the Superior Court's determination that Brandt was not entitled to relief on any of his claims was not an "unreasonable application of" <u>Strickland</u> or based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). Because the Superior Court's adjudication of each of Brandt's claims withstands review under AEDPA, he is not entitled to habeas relief.

**III.    Certificate Of Appealability**

AEDPA codified standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition.  28 U.S.C. § 2253 provides that "[a] certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." Where the district court has rejected a constitutional claim on its merits, "[t]he Brandt must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Applying that standard here, jurists of reason would not find it debatable whether each of Brandt's claims should be denied. Accordingly, a certificate of appealability will be denied.

An appropriate Order follows.


                                                    BY THE COURT:


Date: June 5th, 2014                                s/Arthur J. Schwab
                                                    Arthur J. Schwab
                                                    United States District Judge


cc: All counsel of record